# *#* 56326*6*

*22.*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DAVID R. HUNTER,

                Plaintiff,

and

HONORABLE PETE GREEN,
SECRETARY OF THE ARMY,

                Defendant.

Case: 2:07-cv-14490
Assigned To: Cohn, Avern
Referral Judge: Majzoub, Mona K
Filed: 10-22-2007 At 03:20 PM
CMP HUNTER V GREEN (RRH)

_____/

DAVID A. KOTWICKI (P56070)
DAVID A. KOTWICKI, P.L.C.
Attorney for Claimant
44825 Van Dyke
Utica, MI 48317
(586) 739-9888

_____/

## COMPLAINT AND JURY DEMAND

     **NOW COMES** Complainant, **DAVID R. HUNTER**, by and through his attorney, **DAVID**

**A. KOTWICKI**, and for his Complaint and Jury Demand hereby states:

## INTRODUCTION AND JURISDICTIONAL ALLEGATIONS

1.     This is an employment discrimination action arising at the U.S. Army Tank-automotive and

       Armaments Command ("TACOM").

2.     The issues presented in this case are: Whether Plaintiff David Hunter has been and/or is

       being discriminated against, on the basis of Race (Caucasian), Sex (Male), Age (57),

       wherein he has alleged harassment (non-sexual), resulting in a hostile work environment, and

       that management has, repeatedly and consistently, held him back from career and

promotional advancements, over the course of his career, irrespective of his qualifications and experience, in the U.S. Army Tank-Automotive, Research, Development and Engineering Center (TARDEC), Warren, Michigan.

3. Mr. Hunter also is claiming Retaliation, based upon events which occurred after the date he filed his formal Complaint, as he believes there is a factual basis to establish that his EEO Complaint resulted in retaliatory action against him.[1]

4. Plaintiff is a resident of the City of Royal Oak, Oakland County, Michigan.

5. This is an action based upon Defendant's violation of Plaintiff's rights and protections under Title VII of the Civil Rights Act of 1964, 42 USC 2000e *et seq.*, and the Age Discrimination in Employment Act (ADEA), 29 USC 621 *et seq.*

6. Defendant is a political subdivision of the United States government.

7. The amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest, costs, and attorney fees.

8. This Court has jurisdiction pursuant to 42 USC 2000e-5 and 28 USC 1331, and 28 USC 1343(4), and 29 USC 626c-1.

9. The events giving rise to this cause of action occurred in the Eastern District of Michigan.

## FACTUAL ALLEGATIONS

10. Plaintiff, David R. Hunter is a Caucasian Male, who is fifty-seven (57) years old.

11. On or about January 1991, Mr. Hunter was hired as a temporary employee, to help support the Desert Storm war effort.

---

[1] On March 21, 2003, Mr. Hunter contacted an EEO official for purposes of filing a Retaliation charge based upon alleged retaliatory events.

12.   On or about approximately June-July of 1991, Mr. Hunter applied for, and was accepted as, a permanent employee.

13.   On or about July of 1992, Mr. Hunter became eligible for promotion to the next grade level: (GS-11), based on fulfilling his one year 'in-grade" requirement; however, he did not receive this promotion.

14.   On or about 1992 through 1993, management began "upward mobility" programs, for approximately twelve lower graded secretary/clerk employees.

15.   Upon information and belief, these employees were paid to go to school, under a specially-designed curriculum, and were given promotions to grade level GS-802-09 - *Mechanical Engineering Technician*, upon completion.

16.   Upon information and belief, these individuals were allowed to attend school during work hours, and also were allowed to do their homework during work hours.

17.   Upon information and belief, the majority of these employees were given one or two additional promotions since the first promotion.

18.   Mr. Hunter was never offered any similar program *(as, upon information and belief, required by his Union contract),* to help him improve his career and pay/promotion level.

19.   Despite having not been offered such a program, over the course of his career, Mr. Hunter has made countless efforts on his own, to attempt to improve his career and pay/promotion level.

20.   Mr. Hunter has continually either been rejected for training and/or promotions, and/or presented with requirements and/or obstacles which were not only extremely difficult to complete, but, upon information and belief, not required for similarly-situated employees.

3

21.    By way of example only, during 1992-1993, Mr. Hunter had requested many in-house training courses that he was both interested in, and felt would help his career. None were ever granted to him by management.

22.    On or about 1992-1993, management began a "Reorganization" process.

23.    Upon information and belief, the first two or three years of the "Reorganization" process involved combining previously separate work sections together, and transferring employees, into different work groups.

24.    Upon information and belief, the next two or three years of the "Reorganization" process involved mainly rotating managers to different work groups, and some minor employee movements.

25.    Upon information and belief, the "Reorganization" process, in recent years, has consisted more or less of adjustments to the work groups, as desired by management.

26.    During the "Reorganization" process, Mr. Hunter has been transferred to different work groups, approximately ten times, and has had approximately as many direct supervisors.

27.    On or about 1993, despite requesting the same, Mr. Hunter was not receiving "in-house" training, and management made no effort whatsoever to assist him in obtaining training, to help advance his career opportunities; Rather, he was continually assigned mundane, repetitive tasks, that would do little to advance his career.

28.    As a result of management's continual refusal to provide Mr. Hunter with training and/or promotional opportunities, he decided to continue college, on his own time, to complete his Bachelor of Science degree.

29.    Upon information and belief, the U.S. Army - TACOM/TARDEC, had been promoting

4

various University programs, by giving presentations in the auditorium.

30. Based upon being aware of these presentations, Mr. Hunter thought he would have little difficulty obtaining funding from management, to pay for his education.

31. Initially, Mr. Hunter was required to pay his own education costs, and attend school on his own time, because his supervisor, Ms. Noguera, repeatedly told him that there was no funding available.

32. Despite this statement made by his supervisor, Mr. Hunter knew, that other employees were being compensated for outside education, and that the "upward mobility" employees were receiving special treatment in reference to training and/or education reimbursement as well.

33. In late summer of 1994, Mr. Hunter was finally able to obtain funding to pay for his classes, despite the fact that Ms. Noguera had repeatedly told him that the same was not likely.

34. Mr. Furman, the Area Director at the time, told Mr. Hunter that he would be eligible to convert to a GS-830 Engineer[2], when he finished his Bachelor of Science requirements.

35. During 1995, Mr. Hunter continued going to school, on his own time, with the goal of finishing his Bachelor of Science requirements as soon as possible. However, during this time-frame, he was still not receiving any better promotional and/or training opportunities.

36. On or about January through February of 1996, Mr. Hunter contacted Ms. Tammy Salo's office in Personnel, as Mr. Furman had advised him, to inform her that he would be completing his final classes in approximately the third week of February, 1996.

37. When Mr. Hunter made this call, he actually spoke with a Mr. Sivalelli, and explained that

---

[2] Had Mr. Hunter been converted to a GS-830 Engineer, he would receive a pay increase, and then a promotion to GS-11, and then to GS-12.

5

he had met all other requirements, and that he would be completed with all required curriculum in a few weeks.

38.      In response, Mr. Sivalelli advised him that he would have to send his official Diploma and Transcripts, as certification that he had completed all of his classes.

39.      On or about April 22, 1996, Mr. Hunter sent a letter, with a copy of his transcript from Detroit Engineering Institute, to Mr. Sivalelli. In the letter, Mr. Hunter requested that Mr. Sivalelli advise him if anything else was required.

40.      Mr. Sivalelli never replied, nor requested anything additional.

41.      On or about May 10, 1996, Mr. Hunter sent a message to Mr. Sivalelli, regarding his transcripts, which had been sent from all of Mr. Hunter's colleges.

42.      Mr. Sivalelli replied, by stating that he had received all of the transcripts, but could not help him, due to a TACOM Reduction in Force (*RIF*).

43.      Between the end of July, and the beginning of August 1996, Mr. Hunter's team leader, Ms. Marta Tomkiw, abruptly told him to pack his things, and move to building 231, and report to Mr. Kovanda, for instructions as to where to sit.

44.      Mr. Hunter did as he was told; however, Mr. Kovanda was not available, and instead, Mr. Hunter ended up talking to his new team leader, Mr. Ron Scholtes.

45.      During this time-frame, Mr. Hunter contacted Mr. Sivalelli, to check on the status of his conversion.

46.      Mr. Sivalelli advised him that he would now be required to complete a one-year engineering training detail at TACOM.

47.      Mr. Hunter spoke with Mr. Scholtes about this issue, who assisted Mr. Hunter in registering

for this new requirement.

48.    On or about approximately December 6, 1996, Mr. Scholtes sent Mr. Hunter an e-mail message, from Ms. Salo and Ms. Pheley, regarding his conversion status for the training detail.

49.    On or about 1996,  Mr. Hunter completed his requirements for his Bachelor of Science degree, and began trying to get the conversion to Engineer status processed.

50.    However, Mr. Hunter then had additional requirements and/or obstacles presented to him by personnel management,  and his management chain of command.

51.    Frustrated, Mr. Hunter made several administrative complaints, and filed a Union Grievance, all to no avail.

52.    On or about mid-August of 1997, Mr. Hunter completed his one-year training detail, but his conversion process was again delayed, due to a TACOM Reduction in Force (*RIF*).

53.    On or about the end of 1997, the TACOM RIF was complete, and Mr. Hunter was advised by his supervisor at the time that he would be required to prepare a resume,  and get the resume established in the new "Resumix" system, before he could have his job series changed. He was also told that he would have to prepare a document, which contained job description information.

54.    Due to his already extremely heavy work-load, outside Master's Degree work, and his family responsibilities, he did not have time for this additional requirement.

55.    Frustrated by the continual change in requirements presented to him, Mr. Hunter began to feel discriminated against, and that his conversion had been deliberately delayed by management, and that additional requirements were continually presented, unique to him,

7

for no good reason.

56. On or about early February 1998, Mr. Hunter went to the TACOM Inspector General's office, and spoke with the IG, Mr. Kainz, about what he believed to be a lack of fairness and equality at TACOM.

57. During this conversation, Mr. Kainz asked Mr. Hunter to focus on one example, gave Mr. Hunter an I.G. Action Request Form to fill out, and asked him to provide some background information.

58. Mr. Hunter provided the completed form and information to Mr. Kainz, on or about February 5, 1998.

59. On or about February 27, 1998, Mr. Kainz called Mr. Hunter to his office, to advise him of the results of his investigation. He stated that because Mr. Hunter did not have all of the pertinent information from personnel in writing, he would not be able to help him.

60. In response, Mr. Hunter asked Mr. Kainz to give him the required information in writing, and Mr. Kainz sent the investigation results to him in an e-mail message.

61. On or about March 6, 1998, Mr. Hunter wrote a letter to Senator Carl Levin, a member of the Senate Armed Services Committee, to complain about the lack of fairness and equality at TACOM.

62. On or about March 17, 1998, Mr. Hunter received a letter from Senator Levin's office, requesting that he fill out and return a form.

63. On or about March 21, 1998, Mr. Hunter returned the completed form to Senator Levin's office.

64. On or about March 23, 1998, Mr. Hunter received a copy of a letter from Senator Levin to

8

Colonel Wilson.

65.     On or about early April 1998, Mr. Hunter received a letter dated April 6, 1998, from Senator

Levin, with a copy of a TACOM response, dated April 3, 1998.

66.     On or about April 10, 1998, Mr. Hunter sent an e-mail message to his Sub-Team Leader, Mr.

Jacob Brown, requesting direction regarding his conversion.

67.     On or about May 8, 1998, Mr. Hunter had not received a response from Mr. Brown, and sent

another message, inquiring as to his answer.  Mr. Brown did not answer in writing, but told

Mr. Hunter to send his request to Mr. Scholtes.

68.     On or about June 17, 1998, Mr. Hunter was told by a supervisor that TACOM could

reorganize positions during a RIF, once the impact of the RIF was known.[3]

69.     On or about August 12, 1998, Mr. Hunter had not received any response from Mr. Scholtes

concerning his suggestion, and request for direction, so he decided to meet with him in

person.  At this time, Mr. Scholtes told him to file a grievance through the Union.

70.     On or about August 14, 1998, Mr. Hunter prepared a memo to file, regarding his meeting

with Mr. Scholtes, on August 12, 1998, and began the grievance process.

71.     From on or about 1997 to 2003, Mr. Hunter applied for numerous promotional

announcements, for the GS-11 grade, as a Technician.

72.     Upon information and belief, most all of the available promotions were awarded to minority

employees, even though, upon information and belief, Mr. Hunter had more education, work

experience, and time in grade, than any of the promoted employees.  However, management

---

[3] At this point, Mr. Hunter's conversion had been delayed several times, due to TACOM
Reductions in Force.  Upon information and belief, converting his job series would have had no
adverse impact on any of the RIF's for which his conversion had been delayed.

continued to advise Mr. Hunter that he was not the "best qualified".

73. In July of 2002, management conducted a "mini-reorganization", involving most of the approximately 802 Engineering technicians.

74. Upon information and belief, the engineering technicians had been previously split up, and assigned to vehicle teams; however, pursuant to the "mini-reorganization", they were being brought back together, as a separate team, to process all vehicle spare part acquisitions.

75. During this time-frame, Mr. Hunter began experiencing substantial difficulties with his work packages, and other work-related duties, due to Mr. Frank Pitts' involvement, which included harassment of him by intimidation, and alteration of his work packages.

76. As a result of Mr. Pitts' pattern and practice of harassing and intimidating Mr. Hunter, and interfering with his work packages and duties, Mr. Hunter reported the matters to his supervisors, sought help from TACOM's Equal Employment Opportunity (EEO) department, and ultimately filed an EEO complaint.

77. On or about January 2003, Mr. Hunter continued to perform his Configuration Management duties, for several months after the "mini-reorganization".

78. On or about this time-frame, eventually, another employee took over those duties, and Mr. Hunter began performing more Procurement Work Directives (PWD) packages.

79. While working on PWD packages, Mr. Pitts would occasionally go to Mr. Hunter's work station, and harass him, about recording information in an electronic system that he managed.

80. Mr. Hunter would typically respond, by politely advising Mr. Pitts that the system did not work; however, this would simply provoke Mr. Pitts, who would become more irate and abusive toward Mr. Hunter.

10

81. On several occasions, TACOM computer technicians allegedly checked Mr. Hunter's equipment, and would leave notes, stating that nothing was wrong.

82. At this point, Mr. Pitts began to routinely corner Mr. Hunter in his work station, which did not allow, space-wise, for escape from someone blocking him in, and yell orders at him, point with his hand close to Mr. Hunter's face, and, whether purposefully or inadvertently, spit on him as he talked. This type of action would happen approximately every 4-6 weeks.

83. After a subsequent management inquiry, it was ultimately determined that Mr. Pitts had never authorized Mr. Hunter to use the system that he managed.

84. Between on or about March and May of 2003, Mr. Hunter had suspected that some of his PWD packages had been altered, after he had completed working on them.

85. After investigating the matter, he came to discover that one important package had, in fact, been altered. It was determined that Mr. Pitts had in fact changed, or instructed Engineering to change, this package.

86. After discovering this alteration of his work, Mr. Hunter reported the matter to his supervisors, and informed them that, if something were not done about the situation, he would report the matter to the Inspector General (*IG*).

87. Upon information and belief, Mr. Pitts was subsequently ordered to redo the package, as Mr. Hunter had originally categorized the item.

88. Upon information and belief, shortly thereafter, as a result, Mr. Mark Stine was assigned to reconfigure the system, so that a person's work could not be altered, without a permanent record being created of who had made the alteration.

89. On or about January 2004, Mr. Hunter reported to his supervisor, Mr. Art Adlam, concerning

11

the way he had been treated by Mr. Pitts during the previous year.

90.     Throughout May and June of 2004, Mr. Pitts continued to harass Mr. Hunter.

91.     Upon information and belief, during this time-frame, despite Mr. Hunter continually
        reporting the same, management took no action to put an end to the harassment.

92.     As a result, Mr. Hunter became very distraught, and began seeing Mr. Robert El-Henicky,
        a counselor in the TACOM Employee Assistance Center (*EAC*), for help in dealing with the
        situation.

93.     Upon information and belief, on or about September 2004, management still had done
        nothing to help Mr. Hunter, or to stop the harassment by Mr. Pitts.

94.     During this time-frame, it was again determined that Mr. Pitts had sabotaged a PWD package
        that Mr. Hunter had prepared, and had delayed it for a week as a result.

95.     At this point, due to management's continual failure to correct the situation, Mr. Hunter went
        to the Equal Employment Opportunity (EEO) department, to begin it's formal complaint
        process.

96.     Mr. Hunter ultimately pursued a formal EEO Complaint, on November 9, 2004, alleging that
        he was discriminated against, on the basis of Race (Caucasian), Color (White), Sex (Male),
        and Age (57) wherein he alleged harassment (non-sexual), and that management had
        repeatedly and consistently held him back from career and promotional advancements,
        irrespective of his qualifications and experience, resulting in a hostile work environment.

97.     Mr. Hunter also amended his formal complaint to claim Retaliation, based upon events
        which occurred after the date he filed his Formal Complaint, as he believed, and continues
        to believe that filing his Complaint resulted continuing retaliatory action against him.

98.    On or about September 22, 2004, the assigned EEO Counselor met with Mr. Hunter, and conducted a Pre-Complaint Intake Interview.

99.    During that interview, Mr. Hunter  thoroughly described a pattern and practice of discrimination, provided detailed descriptions of several incidents, and provided a list of potential witnesses to the same.

100.   During the subsequent investigation, the assigned EEO Investigator did not respond to numerous attempts by Mr. Hunter to communicate, regarding the investigation, and amending the complaint to include post-complaint retaliation.

101.   Mr. Hunter's position that the investigative record compiled by his EEO department is incomplete, and his ability to prosecute his complaint at the EEO level was hampered.

102.   On more than one occasion, Mr. Hunter sought to amend his Complaint to include alleged incidents of Retaliation after he filed his Complaint, providing specific allegations of Retaliation.

103.   By way of example, Mr. Hunter alleges that examples of Retaliation included his Team Leader, Mr. Frank Pitts, holding up his work (*described infra*), that he was moved from his former team, to a new "3D" unit, and he was required to leave a note when he left his workstation.

104.   Mr. Hunter has been held at his entry level pay grade, (GS-09) for over 15 years.

105.   Mr. Hunter has been transferred up to ten times.

106.   Mr. Hunter received disparate treatment in training, education, and promotional opportunities.

107.   Mr. Hunter has received excellent performance appraisals every year, and has never been

13

disciplined for any reason.

108.  Despite countless requests, management has not provided Mr. Hunter with a job upgrade program, or training that would have improved his job skills and resulted in promotions.

109.  Between approximately 1997 and 2004, most promotions for his fellow work group GS-802-09 employees, went to younger and/or minority personnel that had less experience, and time in grade, with Mr. Hunter always being characterized: not "best qualified"

110.  Mr. Hunter spent approximately three years, trying to get conversion of his job series from 802 Technician to 830 Engineer, and has applied for numerous promotions to GS-11 grade, and has been rejected.

111.  In the recent past, Mr. Hunter's team leader, Mr. Cherukuri, has stated that upper management was planning to make changes in the leader positions, and that if he remained team leader, he would move toward getting Mr. Hunter the training and promotion opportunities he had been requesting.

112.  Despite the fact that Mr. Cherukuri remained the team leader, nothing changed regarding Mr. Hunter's training and/or promotional opportunities.

113.  Rather, during this time frame, Mr. Hunter was routinely excluded from meetings, and additional training and educational opportunities, including, but not limited to:  Auto Cad, Long term training, and the Mentoring program.

114.  Since filing his EEO Complaint, Mr. Hunter has been routinely criticized, in a humiliating fashion, by his supervisors, including, but not limited to, Mr. Cherukuri stating that "any high school kid" could perform Mr. Hunter's job, during a team meeting, in front of numerous co-workers.

14

115. Mr. Hunter has recently been transferred, the only one from his team, to a new "3D" unit, by his supervisor, Mr. Art Adlam, under the false pretense of receiving further promotion opportunities, none of which have transpired.

116. Mr. Hunter's supervisor recently directed him, and upon information and belief only him, to leave a note on his desk any time he went to the restroom, on break, or left desk for any reason.

117. Discrimination and Retaliation against Mr. Hunter continues to this day.

## COUNT I, VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 USC 2000E *et seq.*, REVERSE RACIAL DISCRIMINATION

118. Plaintiff incorporates by reference paragraphs 1 through 117.

119. At all times, Plaintiff was an employee, and Defendant was an employer, covered by, and within the meaning of, Title VII of the Civil Rights Act of 1964 (*Title VII*), as amended.

120. Plaintiff's race was a factor that made a difference in Defendant's decision to subject him to the wrongful and discriminatory treatment described above.

121. Defendant, by its agents, representatives, and employees, was predisposed to discriminate on the basis of race, and acted in accordance with that predisposition.

122. Defendant's actions were intentional, and with reckless indifference to Plaintiff's rights and sensibilities.

123. If Plaintiff had not been Caucasian, he would not have been treated in the manner described.

124. As a direct and proximate result of Defendant's wrongful acts and omissions, Plaintiff has sustained loss of earnings, earning capacity, and fringe benefits, and has suffered mental anguish, emotional distress, humiliation and embarrassment, and loss of professional

reputation.

**WHEREFORE,** Plaintiff respectfully requests this Honorable Court enter judgment against Defendant in an amount in excess of $75,000.00, and award costs, including reasonable attorneys' fees, and award whatever other relief this Court deems just and equitable, including statutory attorney fees pursuant to Title VII.

## COUNT II, VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 USC 2000E *et seq.*, REVERSE SEX DISCRIMINATION

125.   Plaintiff incorporates by reference paragraphs 1 through 124.

126.   At all times, Plaintiff was an employee, and Defendant was an employer, covered by, and within the meaning of, Title VII of the Civil Rights Act of 1964 (*Title VII),* as amended.

127.   Plaintiff's sex was a factor that made a difference in Defendant's decision to subject him to the wrongful and discriminatory treatment described above.

128.   Defendant, by its agents, representatives, and employees, was predisposed to discriminate on the basis of sex, and acted in accordance with that predisposition.

129.   Defendant's actions were intentional, and with reckless indifference to Plaintiff's rights and sensibilities.

130.   If Plaintiff had not been Male, he would not have been treated in the manner described.

131.   As a direct and proximate result of Defendant's wrongful acts and omissions, Plaintiff has sustained loss of earnings, earning capacity, and fringe benefits, and has suffered mental anguish, emotional distress, humiliation and embarrassment, and loss of professional reputation.

**WHEREFORE,** Plaintiff respectfully requests this Honorable Court enter judgment against

16

Defendant in an amount in excess of $75,000.00, and award costs, including reasonable attorneys' fees, and award whatever other relief this Court deems just and equitable, including statutory attorney fees pursuant to Title VII.

## COUNT III, VIOLATION THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967 (*ADEA*) 29 USC 621 *et seq.*, AGE DISCRIMINATION

132.    Plaintiff incorporates by reference paragraphs 1 through 131.

133.    At all times, Plaintiff was an employee, and Defendant was an employer, covered by, and within the meaning of, the Age Discrimination in Employment Act of 1967 (*ADEA*), as amended.

134.    Plaintiff is a member of the group that the legislature intended to protect in enacting the Age Discrimination in Employment Act of 1967 (*ADEA*), as amended.

135.    Plaintiff's age was a factor that made a difference in Defendant's decision to subject him to the wrongful and discriminatory treatment described above.

136.    Defendant, by its agents, representatives, and employees, was predisposed to discriminate on the basis of age, and acted in accordance with that predisposition.

137.    Defendant's actions were intentional, and with reckless indifference to Plaintiff's rights and sensibilities.

138.    If Plaintiff had not been over 40, he would not have been treated in the manner described.

139.    As a direct and proximate result of Defendant's wrongful acts and omissions, Plaintiff has sustained loss of earnings, earning capacity, and fringe benefits, and has suffered mental anguish, emotional distress, humiliation and embarrassment, and loss of professional reputation.

17

**WHEREFORE,** Plaintiff respectfully requests this Honorable Court enter judgment against Defendant in an amount in excess of $75,000.00, and award costs, including reasonable attorneys' fees, and award whatever other relief this Court deems just and equitable, including statutory attorney fees pursuant to the ADEA.

## COUNT IV- VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 USC 2000E *et seq.*, RETALIATION

140. Complainant incorporates Paragraphs 1 through 139 by reference, as if fully re-alleged herein.

141. Defendant Retaliated, and continues to retaliate, against Plaintiff for having complained about it's discriminatory employment practices described above, including, but not limited to, pursuing Defendant's EEO process, in violation of Title VII of the Civil Rights Act of 1964, 42 USC 2000e *et seq.*

142. Defendant's actions were intentional, with reckless indifference to Plaintiff's rights and sensibilities.

143. As a direct and proximate result of Defendant's wrongful acts, Plaintiff has sustained loss of earning, earning capacity, and fringe benefits and has suffered mental anguish, physical and emotional distress, humiliation and embarrassment, and loss of professional reputation.

**WHEREFORE,** Complainant respectfully requests this Honorable Court enter judgment against Respondent Agency in an amount in excess of $75,000.00, and award costs, including reasonable attorneys' fees, and award whatever other relief this Court deems just and equitable, including statutory attorney fees pursuant to Title VII.

18

Respectfully submitted,

**DAVID A. KOTWICKI, P.L.C.**

By: _____

DAVID A. KOTWICKI (P56070)
Attorneys for Plaintiff
44825 Van Dyke
Utica, MI 48317
(586) 739-9888 Telephone
(586) 739-9892 Facsimile

Dated October 22, 2007

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DAVID R. HUNTER,

                    Plaintiff,

and

HONORABLE PETE GEREN,
SECRETARY OF THE ARMY,

                    Defendant.

*Case: 2:07-cv-14490*
*Assigned To: Cohn, Avern*
*Referral Judge: Majzoub, Mona K*
*Filed: 10-22-2007 At 03:20 PM*
*CMP HUNTER V GREEN (RRH)*

_____/

DAVID A. KOTWICKI (P56070)
DAVID A. KOTWICKI, P.L.C.
Attorney for Claimant
44825 Van Dyke
Utica, MI 48317
(586) 739-9888

_____/

### JURY DEMAND

      NOW COMES the Plaintiff, DAVID R. HUNTER, by and through his attorney, DAVID A. KOTWICKI, P.L.C., and hereby demands a trial by jury of all issues to the within cause of action.

                  Respectfully submitted,

                  **DAVID A. KOTWICKI, P.L.C.**

By:_____

                  DAVID A. KOTWICKI (P56070)
                  Attorneys for Plaintiff
                  44825 Van Dyke
                  Utica, MI 48317
                  (586) 739-9888 Telephone
                  (586) 739-9892 Facsimile

Dated: October 22, 2007

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

County in which this action arose: MACOMB

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

DVAID B. HOULER

**DEFENDANTS**

HONORABLE PETE GREEN,
SECRETARY OF THE ARMY

**(b)** County of Residence of First Listed Plaintiff   OAKLAND
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   MACOMB
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
DAVID A. KOTWICKI, PLC
44825 Van Dyke, Utica Michigan 48317

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Select One Box Only)

☐ 1  U.S. Government Plaintiff
☐ 3  Federal Question (U.S. Government Not a Party)
☑ 2  U.S. Government Defendant
☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Select One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Select One Box Only)

Case: 2:07-cv-14490
Assigned To: Cohn, Avern
Referral Judge: Majzoub, Mona K
Filed: 10-22-2007 At 03:20 PM
CMP HUNTER V GREEN (RRH)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 61 | | |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 62 | | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 62 | | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 63 | | ☐ 890 Other Statutory Actions |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 64 | | ☐ 891 Agricultural Acts |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 65 | | ☐ 892 Economic Stabilization Act |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 66 | | ☐ 893 Environmental Matters |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 69 Other | **LABOR** | ☐ 894 Energy Allocation Act |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 895 Freedom of Information Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 861 HIA (1395ff) | ☐ 900 Appeal of Fee Determination Under Access to Justice |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 862 Black Lung (923) | ☐ 950 Constitutionality of State Statutes |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 865 RSI (405(g)) | |
| ☐ 220 Foreclosure | ☑ 442 Employment | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Select One Box Only)

☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Title VII of the Civil Rights Act of 1964; Age Discrimination in Employment Act of 1967

Brief description of cause:
Race Discrimination, Sex Discrimination, Age Discrimination, Retaliation

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND $** over $75,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND: ☑ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):   JUDGE _____   DOCKET NUMBER _____

DATE
October 21, 2007

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# PURSUANT TO LOCAL RULE 83.11

1.    Is this a case that has been previously dismissed?    ☐ Yes
                                                            ☐ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____


2.    Other than stated above, are there any pending or previously    ☐ Yes
      discontinued or dismissed companion cases in this or any other   ☑ No
      court, including state court? (Companion cases are matters in which
      it appears substantially similar evidence will be offered or the same
      or related parties are present and the cases arise out of the same
      transaction or occurrence.)

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____


Notes :